DUCKER, JUDGE:
The claimants in these twelve claim's have alleged various amounts of damage to their homes and properties situate in Paden City, West Virginia, north of and below State Route 26 and south of *52 and above 8th, 9th and 10th Avenues, as a result of the respondent’s alleged negligent maintenance of the road and collecting surface water and diverting and channeling it through culverts and casting said surface water upon their lands.
The parties agreed that the question of liability of the respondent is the same as to all of the claimants, but that the amounts of damage, if any, are to be determined separately as to the respective claimants, and accordingly the evidence upon the question of liability is made applicable to all of the claims.
A careful and detailed view of the subject properties was taken by the Court at the inception of the hearing. Both claimants and respondent introduced extensive testimony of experts concerning the question of water drainage over and upon the area involved, and all of the expert testimony was to the same effect that continuous saturation of the soil by water from the hillside was the direct cause of the seepage and slides of earth in, under and about the homes and properties of the claimants, including waterlines of the municipal claimant. The experts differed as to whether or not the respondent had so carelessly maintained its road as to prevent the proper drainage from the road and the upper land and had diverted water from natural channels and into artificial channels to the detriment of the claimants.
State Route 26 was formerly a County road running along a ridge south of Paden City before any of the claimants’ homes were built. It is shown on a 1906 topographical map. A picture taken in 1911 shows the road and only the Caldwell and Eddy houses. The road was relocated with a gravel surface in 1929-30, and was blacktopped by the respondent in 1963. When the State took over County roads, including this one, the road and its drainage were substantially the same as they are today, except for the culvert above the Fricker property which was plugged at Mrs. Fricker’s request about 1970 or 1971. At about the same time a drain pipe was put under Kendall Road, which connects with State Route 26 from the southwest, to drain into the ditch along the south side of Route 26. This took care of part of the water that previously had passed through the Fricker culvert, but during hard rains, substantial quantities of water ran across the road and onto the Fricker land.
The several claimants were unanimous and firm in their testimony that water running over the road and through its culverts had soaked into the slope above their homes and properties, and they vividly described the saturation of their lands, *53 causing, in their certain opinion, the downward movement of the hillside and ultimate damage to their homes and properties. George Kapnicky, a geologist, supported the claimants’ views, testifying that surface water running over the road and onto the slope was diffused and not channeled into natural drains. He made specific reference to the Fricker farm, where the culvert had been plugged, but it is apparent from all the testimony that the landslide had commenced long before this culvert was abandoned.
George Sovick, an engineer employed by the respondent, testified that the drainage area above the road directly behind the Fricker farm contained only 1.4 acres, while the Fricker farm itself is a 14.75 acre tract on the slope abutting the road. The entire drainage area above the road is approximately 18 to 20 acres, and about the same acreage owned by the claimants lies below the road and is part of the watershed. Dr. Robert E. Behling, a professor at West Virginia University, with outstanding qualifications as an expert in geology and soils, and William Roth, a soils scientist, both testified that all of the homes were built upon colluvial material, originally unstable and highly susceptible to water saturation and resultant slippage. Roth called the material Vandalia soil and termed it subject to severe limitations for home sites, including slip hazard and high shrink-swell potential. Test holes drilled by the respondent upon the claimants’ lands show conclusively that all of the homes were built on soil which is characterized by both Roth and Dr. Behling as unstable, and these witnesses substantially testified that in their opinions, in view of the natural drainage area above, all of these home sites were unsafe from the beginning, and it was only a question of time until natural forces would produce the results in these cases. As a contributing factor, both Roth and Dr. Behling found natural springs on the hillside which added underground waters to the surface rainfall.
The damage to the Whittington home, which was so severe that the building was demolished and removed from the premises, is an example of water saturation and slippage which cannot be attributed to water from the State road. Dr. Behling testified that the slope above this property was the most severely disturbed by downslope movement, trees were pushed over and it was a very chaotic slope. Further in his testimony, Dr. Behling described the road and adjacent lands as sloping away from the Whittington property and he was emphatic in his opinion that no water flowed from Route 26 or its culverts towards or upon that property. Dr. Behling also noted foundation damage to another home east of the *54 Whittington property, similarly situated on the hillside but even farther removed from Route 26.
Turning our attention from the Whittington property, being the most easterly of the claimants’ several parcels of land, to the most westerly parcel, the Caldwell property, we have a difference of opinion in the testimony of Mr. Kapnicky and Dr. Behling. Mr. Kapnicky attributed damage to this property from waters passing through “Culvert No. 5”, but Dr. Behling testified that the water from this culvert was following a natural channel, and at least one-half of that water would not reach the Caldwell property. Dr. Behling further stated that in his opinion this house was built on a slump block and that renewed activity of the slump block created the tension cracks he found in the back of the house and the. bulging out in front. In his opinion the Eddy house also was built upon a slump block.
To some extent at least it would have been possible for these claimants to have protected their properties by pilings, cribbing or by well engineered drainage. While efforts were made, some of them apparently did more harm than good. For example, the Fricker backyard was excavated to slope towards the hillside, holding water instead of releasing it. House gutters and downspouts collected and discharged water upon the already unstable soil near some of the residences, causing more water saturation and instability. In practically every case, when these homes were built a cut was made into the slope to make level ground for the building, thereby lessening support of the hillside.
The law applicable to this case is well stated by Judge Petroplus in Whiting v. State Board of Education, et al., 8 Ct. Cl. 45, as follows:
“It is well established law that land at lower levels is subject to the servitude of receiving waters that flow naturally upon it from adjoining higher land levels, and that unless a property owner diverts the natural flow of surface water in such a manner as to damage the property of another, there is no liability on the owner of the higher property. Unless a landowner collects surface water into an artificial channel, and precipitates it with greatly increase- or unnatural quantities upon his neighbor’s land, causing damage, the law affords no redress. If no more water is collected on the property than would naturally have flowed upon it in a diffused manner, the dominant tenement cannot be held liable for damage to land *55 subject to the servitude of flowing waters. The evidence in this case does not reveal that the flow was increased in volume or changed in its character to the substantial damage of the Petitioner. Nor was it shown by evidence that the flow accelerated or was artificially channeled so as to increase the servitude upon Petitioner’s lot as was shown in Manley v. Brown, 90 W. Va. 564, 111 S.E. 505, cited by Petitioner.
“To constitute a moral obligation of the State justifying the appropriation of public funds, it is necessary that an obligation or duty be imposed on the State, by Statute or Contract, or that wrongful conduct be shown, which would be judicially recognized as legal or equitable in cases between private persons. State ex. rel. Cashman v. Sims, 130 W. Va. 430, 43 S.E. 2d 805. In the recent decision of State ex. rel. Vincent v. Gainer, 151 W. Va. 1002, (1967), our Supreme Court of Appeals affirmed prior decisions holding that whether such moral obligation exists is a judicial question, and proof of negligence by the State Road Commission was required to be shown.
“The common law rule that surface water is considered a common enemy, and that each landowner may fight it off as best he can prevails in Virginia and West Virginia, with the modification that an owner of higher ground may not inflict injury on the owner of lower ground beyond what is necessary. Norfolk & W. R. Co. v. Carter, 91 Va. 587, 22 S.E. 517, Jordan v. Benwood, 42 W.Va. 312, 26 S.E. 266, and Lindamood v. Board of Education, 92 W.Va. 387, 114 S.E. 800.”
Culverts are required for the protection of our highways and an extraordinary number of culverts necessarily are provided in the building and maintenance of highways in West Virginia. It stands to reason that these culverts discharge into natural drains wherever possible as engineering and simple logic require a culvert where a road is to pass over and through a natural drain. While the claimants contend that waters were allowed to spread over practically all of the hillside, we do not believe they have proved by a preponderance of the evidence that the respondent did anything to substantially change the course of the flow of waters down the hillside from the time the culverts were installed, prior to the State’s ownership. If there were no culverts at all, it appears that the properties lying to the east would receive much less water and as you go down the highway to the west the properties would receive more water, as the road without culverts would itself *56 become a drain and the waters running down the highway would eventually flow onto the more westerly properties. As a matter of fact, however, the greatest damage was done to the most easterly property, being the Whittington residence, which we believe was not affected by water from Route 26, and one of the least damaged homes was Mrs. Caldwell’s, which is the most westerly of all the properties. Every road, as well as every house, roof, driveway or other hard surface, is bound to collect water and accelerate its flow, so some acceleration and accumulation of run-off is an unavoidable consequence of the construction of roads.
The expert witnesses for both sides in this case agree that the continuous saturation by water of the hillside above the claimants’ properties over a period of many years was the direct cause of the downslope movement of the land. The difference of opinion is whether or not the State road was a substantial contributing factor, and whether the respondent diverted waters from natural channels and into artificial channels to the detriment of landowners over whose lands the waters flowed. Considering all of the facts and circumstances developed at the hearing of these cases, and the legal principles applicable thereto, the Court is of opinion that there is not sufficient proof that acts or omissions of the respondent were the direct, proximate cause of the damages sustained by the claimants.
The Court is not unmindful of the disaster which has overtaken these claimants. According to the respondent’s own witness, a qualified real estate appraiser, the total damages sustained by the claimants stands at $63,078.00. The claimants’ witness fixed damages at $107,078.00. Several of these claimants purchased their properties after 1967, when the hazardous condition of the hillside was well-known by many people but was not disclosed to the purchasers. However, our duty is plain, and reluctantly we hold that while many contributing factors brought about the damages complained of, nothing that the respondent has done or failed to do is sufficient to support awards in any of these cases.
For the foregoing reasons the Court is of opinion to and does hereby disallow these claims.
Claims disallowed.